CITIZENS' ST. R. CO. v. CITY RY. CO.

(Circuit Court, D. Indiana. November 10, 1894.)

No. 8,866.

1. STREET RAILROADS—RIGHT TO USE STREETS.
The general act (Act Ind. June 4, 1861; Rev. St. Ind. 1881, § 4143 et seq.)¹ under which a street-railway company was organized, giving perpetual corporate existence, required that, before commencing the construction of any street railroad through the streets of any city, consent of the common council thereto should be obtained. A city ordinance gave such consent to the company to lay its tracks in certain streets, with the right to operate the railway for 30 years. During that period the term

¹ Rev. St. 1894, § 5450 et seq.

was extended by ordinance to 37 years. *Held* that, whether the city had or had not authority to impose such limitation of time, the company had, during the enlarged term, an unexpired franchise, which the courts should protect against wrongful impairment, the remedy being the same whether its rights in the streets were perpetual or limited, although the two positions were inconsistent.

**2.** SAME—POWER OF CITY TO LIMIT TERM OF USE OF STREETS.
The city had no power so to limit the term. Per Woods, Circuit Judge, Baker, District Judge, dissenting.

**3.** SAME—GRANT TO RIVAL COMPANY OF RIGHT TO USE STREETS.
Complainant, a street-railway company organized under an act (Act Ind. June 4, 1861; Rev. St. Ind. 1881, § 4143 et seq.)[1] which required it, before commencing the construction of its road through the streets of the city, to obtain the consent of the common council thereto, obtained such consent to lay its tracks in certain streets, and to operate the railway for a certain term. Before the expiration of that term, an act constituting a new charter for the city (Act Ind. March 6, 1891) created a board of public works, with power to authorize, by contract, street-car companies to use any street in such city, and to prescribe the terms and conditions of such use, such contracts to be approved by the common council; and a contract was so made and approved, granting to defendant company the right to lay and maintain lines of street railway on certain streets, many of which were occupied by complainant's tracks. *Held,* that complainant was not entitled to equitable relief in respect to streets for its occupation of which it had not obtained the consent of the city, but that, as to streets occupied by it with such consent, the power to make new contracts was not intended as a repeal of franchises of existing companies, and defendant should be enjoined from running its cars on complainant's tracks, or laying its rails so as to prevent or needlessly impede the running of complainant's cars.

This was a suit by the Citizens' Street-Railroad Company against the City Railway Company to enjoin defendant from interfering with complainant's use of certain streets in the city of Indianapolis, or with the operation and maintenance of complainant's street-car lines in said city, and to establish complainant's rights in the premises. A motion to dismiss the bill was denied (56 Fed. 746), and the cause was heard on the pleadings and proofs.

An ordinance of the city of Indianapolis passed January 18, 1864, contained the following provisions:

"Section 1. Under and by virtue of an act of the general assembly of the state of Indiana, entitled 'An act to provide for the incorporation of street railroad companies,' approved June 4th, 1861, and by virtue of the powers and authority of the common council otherwise by law vested, consent, permission and authority are hereby given, granted and duly vested unto the company, organized with R. B. Catherwood as president, a body politic and corporate, by the name of the 'Citizens' Street-Railway Company of Indianapolis,' and their successors to lay a single or double track for passenger railway lines, with all the necessary and convenient tracks for turnouts, side tracks and switches, in, upon and along the course of the streets and, alleys of the city of Indianapolis, hereinafter mentioned; and to keep, maintain, use and operate thereon railway cars and carriages, in the manner, and for the time, and upon the conditions, hereinafter prescribed."

"Sec. 15. The right to operate said railway shall extend to the full time of thirty years from the passage hereof; and the said city of Indianapolis shall not, during all the time to which the privileges hereby granted to said company shall extend, grant to, or confer upon any person or corporation, any privilege which will impair or destroy the rights and privileges herein granted to the said company."

---

[1] Rev. St. 1894, § 5450 et seq.

A further ordinance, passed April 7, 1880, provided that section 15, quoted above, be so amended as to read "thirty-seven" years instead of "thirty."

Benjamin Harrison and Miller, Winter & Elam, for complainant.

A. C. Harris and Elliott & Elliott, for defendant.

Before WOODS, Circuit Judge, and BAKER, District Judge.

WOODS, Circuit Judge. In respect to the question of jurisdiction, I am content with the decision heretofore made in this case, and reported in 56 Fed. 746.

The corporate existence and the franchise of a street railway company organized under the law of 1861 (Rev. St. Ind. 1881, § 4143 et seq.) [1] are derived directly from the state, but are subject to the condition that the consent of the common council shall be obtained to the location, survey, and construction of any street railroad through or across the public streets of any city before the construction of the same shall be commenced. The consent of the common council being required, it is in a sense true that the franchise is granted by the city, since the ultimate right is acquired or becomes effective only upon the giving of that consent. Andrews v. Pipe Works (7th Circuit) 10 C. C. A. 60, 61 Fed. 782. The power to construct tracks, switches, side tracks, or turnouts upon the streets, and, by implication, the right to run cars thereon, is conferred by the statute, or, in other words, is derived directly from the state, so that, strictly speaking, the city does not grant the franchise, but simply consents to its exercise. Detroit Citizens' St. Ry. Co. v. City of Detroit (C. C. A., 6th Circuit; decided Oct. 2, 1894) 64 Fed. 628. The right to give or to refuse consent implies the right to prescribe terms, and the terms need not, as I conceive, have direct relation to the specified subjects of "location, survey, and construction." They may embrace any reasonable requirement concerning the operation, as well as the construction, of the road, consistent with the statute.

Carefully read, the first and fifteenth sections of the ordinance of January 18, 1864, show the unqualified or absolute consent of the common council given to the Citizens' Company "to lay" its tracks upon the streets named; but its consent to the use of cars on the tracks, or to the operation of the railway, was extended only to the term of 30 years. Is that restriction valid and binding? I am inclined to the view that it is not.

Subject to the reserved power of the legislature to amend or repeal the act, perpetual corporate existence was given in explicit terms; and, in the absence of express or implied limitation thereon, the necessary presumption is that the franchise granted was intended to be of like duration, subject only to legislative revocation. It is not to be supposed that the legislature intended that there should be corporate existence without a franchise,—the only reason for such existence. It is not a question of perpetuity or of irrevocable right. If it were, different rules of construction would prevail. No presumption or inference could be allowed in favor of a perpetual right, and every reasonable intendment against it should be in-

---

[1] Rev. St. 1894, § 5450 et seq.

dulged. But danger in that direction lurks rather in the supposed power of the common council. If it had authority to agree to a franchise for 30 years, it might, with equal conclusiveness, have stipulated for one of 60 or 90 years, or any longer term, imposing upon the city, it might be for generations, the evils of a monopolistic perpetuity. Thirty years are too many for a burdensome or unjust grant. As was said in Taylor v. Railway Co., 80 Mich. 77, 45 N. W. 335, it is highly important that the legislature should retain the power to pass enactments for the control of these quasi public corporations suitable to changed conditions of affairs. The village or small city cannot well provide regulations and ordinances applicable to a large city.

If agreements by common councils like the one in question are authorized and binding, they must, when made, operate to suspend, pro tanto, the reserved power of the legislature, by repealing the act, to terminate the life of companies organized under it. They are inconsistent with that power. On the contrary, if, when made, the agreements create no vested right because made subject to the power of the legislature to revoke or modify them, then in legal contemplation they are without force, and the power of city councils to make them is a mere pretense. It is a delegated power to make an agreement which cannot bind, or ought not to bind, one party, the corporation, because it does not bind the other party, the state. In respect to such powers the city is the agent of the state; and, besides being anomalous, the proposition that the city and company will be bound by such contracts, and the state not bound, is manifestly unjust and unfavorable to the public interests.

The statute is a general one, designed for uniform application to all cities, but by the proposed construction uniformity is impossible. An amendatory act could not affect all cities alike, and even in the same city one company might be amenable to legislative action from which another company would be exempt. It was well to provide, as was done in the twelfth section of the act of 1861, that the exclusive powers of the cities over their streets should remain unimpaired, except as necessarily affected by the presence and operation of the railways authorized to be there. Those powers, it was held in Eichels v. Railroad Co., 78 Ind. 261, did not include the power to grant the use of streets for street railways, and they can be regarded, since the passage of the act of 1861, as having relation, not to the duration or termination of street-railway franchises, but rather to the manner of their exercise. If it could be said that the city had authority in the exercise of local self-government, and by virtue of its general control over streets, to grant such franchises or to consent to their enjoyment, it might follow that a grant for a term of years would be valid, and would confer a vested property right which could not be destroyed by a repeal of the charter of the company to which it was granted. For instance, in New York the title to streets is vested in the city, and by reason of that fact it was held, in People v. O'Brien, 111 N. Y. 1, 18 N. E. 692, that an easement granted by the city of New York to a street-railway company for a limited time con-

stituted an indefeasible title in the land, which was not terminated by a repeal of the railway charter; but that could not be so in Indiana, where the city has no title to the streets, and has not authority by virtue of its general powers, and outside of the street-railway acts, to grant the use of streets to street-railway companies. The general powers of control, as defined in the city charter, are the same from one day to another, and must be of constant application, whether the street railways are operated, and the franchises owned, by one company or another. The power to limit or to terminate such franchises is a part of the power to grant them, and upon reason, as well as authority, belongs to and remains in the sovereign or legislature, unless expressly or by clear inference bestowed elsewhere. The question of local self-government, manifestly, is not essentially involved.

This view involves no fraud or hardship upon the people of the city, because it is always in the power of the legislature to authorize the imposition upon any company of additional restrictions, productive of revenue or other advantage to the public. The case of Sioux City St. Ry. Co. v. Sioux City, 138 U. S. 98, 11 Sup. Ct. 226, affords an illustration. In the nature of things, a street railway, once established where needed, will be of perpetual and increasing utility; and there seems to be no good reason why the franchise should cease while the utility lasts, though there may arise from time to time, and within periods much shorter than 20 years, necessity for changing the regulations, limitations, or conditions under which the franchise shall be employed. How far the power to make such changes shall be committed to local authorities is a matter of legislative discretion. Under the act of 1861 it is retained by the legislature. That body may amend, or, if it chooses, it may repeal, the statute, and so end all franchises and corporate life granted under it.

According to some authorities, when a charter is repealed, provision must be made for a disposition of the corporate property without confiscation. In People v. Boston, etc., Ry. Co., 70 N. Y. 570, speaking of the reserved power to alter, amend, and repeal laws authorizing corporations, the court said:

"Under this reserved power the legislature may impose upon railroad corporations such additional restrictions and burdens as the public good requires. It may not confiscate property."

In Dash v. Van Kleeck, 7 Johns. 477, it was said:

"It is repugnant to the first principles of justice and the equal and permanent security of rights to take, by law, the property of an individual without his consent, and give it to another."

These expressions are reiterated and approved in People v. O'Brien, supra. See, also, Detroit v. Detroit & H. P. R. Co., 43 Mich. 140, 5 N. W. 275. But in Greenwood v. Freight Co., 105 U. S. 13, 19, Justice Miller, speaking for the court of the effect of the repeal of the charter of a corporation, said:

"If the essence of the grant of the charter be to operate a railroad, and to use the streets of the city for that purpose, it can no longer so use the streets of the city, and no longer exercise the franchise of running a railroad in the

city. In short, whatever power is dependent solely upon the grant of the charter, and which could not be exercised by unincorporated private persons under the general laws of the state, is abrogated by the repeal of the law which granted these special rights. • Personal and real property acquired by the corporation during its lawful existence, rights of contract, or choses in action so acquired, and which do not, in their nature, depend upon the general powers conferred by the charter, are not destroyed by such a repeal; and the courts may, if the legislature does not provide some special remedy, enforce such rights by the means within their power. The rights of the shareholders of such a corporation to their interest in its property are not annihilated by such a repeal, and there must remain in the courts the power to protect those rights."

In that case, which concerned a street-railway franchise, the repealing act contained express provision for compensation to be made by the corporation, which was authorized to "enter upon and use any part of the tracks of any other street railroad," if the corporations interested could not agree upon "the compensation to be paid therefor;" so that the effect of a repeal without provision for such compensation was not before the court. Nevertheless, the principle declared, I think, must be accepted as sound. 'The unrestricted right of repeal being reserved by the legislature, a repeal must be regarded as valid and effective, whether or not accompanied with provisions for the just disposition of the corporate property rights. If such provision is not made, "there must remain in the courts the power to protect those rights." But, without statutory provision to that effect, it is not perceived how a court could compel a new company to take the tracks and equipment of the company whose franchise had been terminated.

If, therefore, the right of the Citizens' Street-Railroad Company to occupy the streets of the city and run its cars upon existing lines has ceased, and under its contract the City Railway Company has a right, not, of course, to take possession of and use the tracks of the other company, but to put its own tracks in the place thereof, then we are confronted with a case either of indirect confiscation or of the destruction of property. The Citizens' Company must either remove its tracks, destroying their value, or it must accept such price as the City Company shall choose to give, and that is equivalent to confiscation. While an enactment to that effect would perhaps not be invalid, a construction which leads to such results should not prevail when a reasonable interpretation is possible which involves no wrong or hardship either to the parties or to the public. The decision in Lewisville Natural Gas Co. v. State, 135 Ind. 49, 34 N. E. 702, overruling City of Rushville v. Rushville Natural Gas Co., 132 Ind. 575, 28 N. E. 853, is, I think, not without significance in respect to the interpretation of the statute now under consideration.

The power given street-railway companies by the statute to mortgage their property and franchises indicates a purpose that the franchise should be a continuing one. Of what value is a mortgage on a franchise which is to expire before or near the time when the mortgage will be enforceable?

The doctrine that parties may, by their conduct, put an interpretation upon their contracts, is not applicable where adverse pub-

lic interests are involved.    The public is not bound by the acts of officers contrary to law, no matter how long maintained or acquiesced in.    According to Reissner v. Oxley, 80 Ind. 580, to which reference has been made, parties may interpret their own contracts "so long as their interpretation does not result in a contract which, for some reason, is in itself unlawful."

The act of 1891, which affects the city of Evansville alone, cannot be regarded as a legislative construction which should operate to give the act of 1861 a meaning which otherwise, in the judgment of the court, it did not have.    That act prohibited the common council and other authorities of that city from extending any franchise or franchises affecting the streets of the city during the term for which they were originally granted by the city councils or other authorities.    This presupposes, but does not sanction, the original grant for a term, nor does it confer a new power to make such term grants after the expiration of existing terms.    It simply forbids what in this argument has been claimed to have been unlawful without such inhibition, namely, agreements for extending terms before they had expired.    If such agreements had been theretofore unlawful, this statute should not be regarded as a legislative declaration of their legality.

If the common council had authority to impose the original limitation of 30 years, then, in my opinion, the 7-years extension was valid.    The ordinance of April 7, 1880, granting that extension, if otherwise valid, as I think it is, was not without consideration,—in the mutual obligations and interests of the parties; and granted, as it was, at the request of the company, its acceptance should be inferred.

Upon either view of the council's power, therefore, the complainant has an unexpired franchise, for the protection of which it was entitled to invoke the action of the court; and that, too, I think, without being driven to an election between the two theories.  The remedy sought is the same in character, whether obtainable upon one proposition or the other.    The same public interest which forbids an interpretation of the contract by reference to the conduct of the parties, excluding the idea of estoppel, bears upon this question, and entitles the plaintiff, upon a proper presentation of the facts, to a decree according to the law as determined by the court; and, even if no public right were involved, it seems to me that an election would not be necessary.

This brings us to a consideration of the rights of the defendant, the City Railway Company, and its alleged doings in derogation of the rights of the complainant.

By the act of March 6, 1891, constituting a new charter for Indianapolis, there was created a board of public works, which was given power "to authorize and empower by contract telegraph, telephone, electric light, gas, water, steam, street car or railroad companies to use any street, alley or public place in such city, and to erect necessary structures therein, and to prescribe the terms and conditions of such use, to fix by contract the prices to be charged to patrons: provided, that such contracts shall in all cases be submitted by said

board to the common council of such city, and approved by them by ordinance before the same shall take effect." Acts 1891, p. 169. Under this power the contract of April 24, 1893, as set out in the ordinance of approval, passed the next day, which is made an exhibit in complainant's bill, was executed. In terms it granted to the defendant company "the right to lay and maintain" its proposed lines of street railway, to be operated by electricity or other improved power, upon certain streets named, many of which are already occupied by the tracks of the complainant, and required the lines to be so located, it is claimed, as necessarily to interfere with the plaintiff's line, and obstruct the running of its cars. The proviso in the fourth section of this contract is noteworthy. It reads:

"Provided, however, that in addition to the lines herein specified, the party of the second part will be granted the right to build the line extending from Washington street to the city limits, both north and south, on such streets as may be designated by the board of public works, and approved by ordinance passed by the common council of said city."

There is here no stipulation, nor, as I think, fair implication, that the additional line so proposed to be granted shall come under, or be in any particular governed by, the agreement made in respect to other lines, and it does not appear that the board made any further agreement on the subject. It simply designated the streets upon which the additional lines should be laid; and, for the apparent purpose of supplying the defect, the common council added to its ordinance of approval, passed May 13, 1893, a clause to the effect that the right so conferred should be subject to the terms, provisions, and conditions of the contract of April 24th, and the ordinance approving that contract.

By the act of 1891, distinct powers are conferred upon the board of public works and upon the common council, respectively, and a just regard for the rights of the public requires that the distinction should be respected. The power of the council in this matter was simply to approve or refuse to approve the contract of the board. If the mere designation by the board of the additional line amounted to a contract, it was the province of the council to approve it in that shape or disapprove it. There is nothing to show that the board intended, and it certainly did not stipulate, either expressly or by necessary implication, that the lines so designated should be held and operated under the previous agreement. The rule is elementary "that, when the mode of contracting is especially and plainly prescribed and limited, that mode is exclusive, and must be pursued." Dill. Mun. Corp. § 449; City of Superior v. Norton (C. C. A., 7th Circuit) 63 Fed. 357; Terre Haute v. Lake, 43 Ind. 480; Francis v. Troy, 74 N. Y. 338. In Head v. Insurance Co., 2 Cranch, 127, 169, Chief Justice Marshall said:

"The act of incorporation is to them an enabling act. It gives them all the power they possess; it enables them to contract; and, when it prescribes to them a mode of contracting, they must observe that mode, or the instrument no more creates a contract than if the body had never been incorporated." Approved Merrill v. Monticello, 138 U. S. 673, 687, 11 Sup. Ct. 441.

While it is not a question which need be decided, I incline strongly to the opinion, upon the showing made, that the City Railway

Company acquired no right to lay its so-called "north and south line."

On the other hand, I am of the opinion that the complainant is not entitled to equitable relief in respect to its alleged right in the street so designated for the use of the defendant. Prior to that designation the complainant had no lines upon those streets except a fragment on Pennsylvania street, which had been practically, if not legally, abandoned. By its own charter, as I construe it,—indeed, according to the plain letter,—it had no right to commence construction on a particular line without first having obtained the consent of the council to the "location, survey, and construction" proposed. The necessity for this consent was not affected, as I think, by anything contained in the ordinance of January 18, 1864, or in the supplemental ordinance of September 18, 1865. Besides, the entry of the complainant upon those streets was in violation of the ordinances of 1889 and 1893; and, if rights were thereby acquired, the complainant, in view of all the circumstances, should rely upon the courts of law for their defense, rather than look to equity for their establishment. The question whether the last-named ordinances are valid or not need not be considered, because by its own charter the complainant had no right to enter upon a street without the consent of the city, and the city was free, with or without reason, to give or withhold its consent.

In respect to other streets, the defendant has denied, by its answer, the assertion of any claim to the present occupancy of the part of any street upon which the tracks of the complainant are laid, or that it desired to lay and operate electric lines on any street on which the complainant was, when its original bill was filed, operating any such electric line, "until after the expiration of its right thereto, if any it has." But from the terms of the contract and ordinance under which the rights of the defendant are asserted, from the notice which it served upon the complainant, from all the evidence upon the point, as well as from the arguments of counsel, it is evident that the defendant has been acting upon the assumption that the complainant's franchise and its right of possession have ended, and that under its contract the defendant may take the possession which the complainant has held of the streets, if not, indeed, of the complainant's tracks.

The power given by the act of 1891 to authorize and empower, by contract, companies of the various kinds named to use any street of the city, I think it clear, was not intended as a repeal of the franchises of existing companies; no more so of street-railway companies than of the various railroad companies whose roads occupy streets of the city. In so far, therefore, as the contract of April 24, 1893, by its terms confers, or attempts to confer, upon the defendant company the right to lay its tracks in the place of the tracks of the Citizens' Company, or to appropriate those tracks, it is an invasion of the rights of the latter company, and should be enjoined. I am not to be understood as meaning that under the act of 1891 the city may not authorize the defendant or any other company to lay its tracks in the same streets on which the complainant's tracks

are laid, but without additional legislation the cars of one company may not, without consent, run upon the rails of another company, nor may the rails of one be so laid as to prevent or needlessly impede the running of the other's cars.

Decree may go accordingly.

BAKER, District Judge. The franchise to be a corporation, with the right of perpetual succession, is derived by the complainant directly from the state. Rev. St. Ind. 1881, § 4143 et seq.[1] The statute which imparts to it its corporate faculties confers upon it no right to enter upon the streets of any city to construct and operate a street railroad therein. It is expressly enacted that "all street railroad companies shall first obtain the consent of the common council to the location, survey and construction of any street railroad through or across the public streets of any city before the construction of the same shall be commenced."

It is clear that the state has not undertaken directly to confer upon the complainant the right to occupy and use the streets of the city for street-railroad purposes. Under the franchise and powers granted to it by the state, it is without authority to enter upon the streets of the city to construct and operate a railroad. This right is derivable from the consent of the city alone. Whether consent shall be granted or refused is exclusively within the control of the city. The right to occupy and use the streets of a city for railroad purposes is a franchise, and is wholly distinct from the franchise to be a corporation, which is derived directly from the state. The latter franchise cannot be sold or conveyed unless express statutory authority is granted for that purpose. The franchise to use the streets for railroad purposes—the right of way on which to build and operate a railroad for profit—is the subject of sale and conveyance. Railroad Co. v. Delamore, 114 U. S. 501, 5 Sup. Ct. 1009. The consent of the city imparted to the complainant a valuable franchise, which, without such consent, it would not have possessed. The state gave it the capacity to receive and enjoy this right or franchise, provided the city saw fit to grant it. The power to grant or refuse resided in the city alone, and it carried with it the right to impose any terms not forbidden by law. If the city may refuse permission to use the streets at all, it must have the right to fix a limit to the term of their use. The greater power must include the less. He who can give the whole can give a part. He who can grant absolutely can grant with a condition, reservation, or limitation. Whether street railroads shall be permitted to occupy the streets at all is left wholly with the city to determine upon its own judgment of the public convenience and welfare. The ordinance of 1864 was an entirety, to be accepted or refused just as it was, and its acceptance was a condition precedent to the occupancy of the streets. Nothing, therefore, could make the ordinance a consent but the performance of the condition,—the acceptance of the ordinance as a whole. City of Allegheny v. Millvale, E. & S. St. Ry. Co. (Pa. Sup.) 28 Atl. 202.

---

[1] Rev. St. 1894, § 5450 et seq.

The power to determine whether, and how long, street railroads may occupy the streets of a city, primarily resides in the state; but it is a power whose exercise has been wisely delegated to those who are directly interested in these questions. There is less danger of wrong and injustice in committing their determination to the city than there would be if the legislature should determine them directly. The authorities of the city acting upon matters of local concern directly affecting themselves and their fellow citizens are not more likely to abuse their trusts in fixing the terms upon which a street railroad may occupy the streets of the city than the legislature would be. Local self-government and home rule in matters of municipal concern are of the essence of a republican form of government. Abuse of these delegated powers are securely guarded against by the superintending power of the state to correct them. It seems to me that the common council had ample power to grant to the complainant the right to use the streets for 30 years, subject to the paramount power of the state to alter the term.

The fact that the complainant is invested with perpetual corporate existence does not, in my opinion, in any wise affect the power of the city to limit the use of the streets for railway purposes to a definite term of years. A corporation having a limited term of existence may acquire a title to property extending beyond the term of its corporate life. So, on the other hand, a corporation having perpetual existence may acquire property for corporate use for a term of years or in fee, to be determined by the terms of the grant under which its title is acquired.

Nor does the power of the state to alter the term, in my judgment, affect the binding force of the contract between the city and the street-railroad company. The obligation of a contract or a law is not affected or impaired by the mere fact that it may be determined by the happening of some uncertain event in the future. Until the contingency arises, upon the happening of which their existence is to be determined, they are as binding and obligatory as though they were never to terminate. While the power of the state to alter or repeal remains unaffected, neither the city nor the railroad company retains any rightful power to impair or defeat the binding force of the contract evidenced by the ordinance and its acceptance.

Neither does this view result in the confiscation of corporate property, nor in injustice to either the city or the railroad company. Each enjoys exactly what was mutually and understandingly agreed upon. "Consensus facit jus." The denial of this right, on the contrary, would operate as a fraud upon the inhabitants of the city. It cannot be doubted that, if it had been understood at the time the ordinance was adopted that the complainant would thereby acquire the right to use the streets in perpetuity, it would have been required to yield greater returns to the city than were exacted, or it would have been denied the right to use them at all. If it be conceded that the necessity and utility of street railroads will increase with the growth of the city's population, still the supply of such need may be, as it has been, safely committed to those charged

with the conduct of its municipal affairs.    Courts ought not to construe the statutes, unless such construction is imperatively demanded, so as to deny to the city the power to determine, upon its view of the needs of the public, when and how long and by whom its streets shall be occupied by railroad tracks.    Since the parties, by mutual contract, have agreed on the measure of their respective rights, no question can arise as to what ought to be done with the property of complainant when its contract rights expire by efflux of time, further than to protect the rights of each as fixed by the contract.

Nor does the fact that power was given to mortgage its property and franchises enlarge the right of the complainant to occupy the streets.    The mortgagees and bondholders were bound to inquire into the title of the mortgagor, and they will be presumed to have made their investment on the faith of the title as disclosed by the statute of the state and the ordinances of the city.  · No injustice is done them, for they get precisely what they contracted for.    If it should be held that the complainant acquired, under the ordinance, a right to the use of the streets in perpetuity, it would obtain a franchise of inestimable value, contrary to the terms of the ordinance, and in violation of the rights and just expectations of the inhabitants of the city.

In my opinion, the' common council had the power to agree with the complainant upon the length of the term, as a condition of its consent to its occupancy of the streets.    Having the right to agree upon the term, it follows that it had the right to agree upon an enlargement of the term.    In my judgment the enlarged term was validly granted upon a sufficient consideration; and it has been accepted, so that the rights of the parties have become fixed beyond the power of change by them except by mutual consent.

It follows that the complainant has an unexpired franchise, for the protection of which against wrongful impairment it has the right to invoke the aid of the courts.    Nor do I think the complainant is remediless because it relies upon inconsistent positions for relief.    The theory upon which it seeks to maintain its right to relief is the same whether its franchise to use the streets is perpetual or whether it expires in seven years.    The relief obtainable in the present suit is the same in kind whether its rights in the streets are limited or perpetual.    A court will not refuse appropriate relief simply because the complainant has asked for greater relief than the facts of the case will warrant.

This brings us to consider the rights of the City Railway Company and its acts in derogation of the rights of the complainant.

The act of March 6, 1891, which constitutes the charter of the city of Indianapolis, confers upon the board of public works, which was thereby created, the power "to authorize and empower by contract, telegraph, telephone, electric light, gas, water, steam or street car or railroad companies to use any street, alley or public place in any such city, and to erect necessary structures therein, and to prescribe the terms and conditions of such use, to fix by contract the prices to be charged to patrons: provided, that such contract shall

in all cases be submitted by said board to the council of such city, and approved by them by ordinance before the same shall take effect." Acts 1891, p. 169, § 59. Under this power the contract of April 24, 1893, which is set out in the ordinance of approval passed the next day, and which is made a part of the bill of complaint, was executed. The contract granted to the defendant company the right to lay and maintain its lines of street railway to be operated by electricity or other improved power upon certain designated streets, many of which are already occupied by the tracks of the complainant, and required the lines of the defendant company to be so located, it is alleged, as necessarily to interfere with the complainant's lines, and to obstruct the running of its cars. The contract further provided "that, in addition to the lines herein specified, the party of the second part will be granted the right to build a line extending from Washington street to the city limits, both north and south, on such streets as may be designated by the board of public works, and approved by ordinance passed by the common council of said city." In May, 1893, the board of public works designated certain streets extending from Washington street to the city limits, both north and south, as the streets on which the defendant company was to be granted the right to lay and maintain a line of street railway. The common council, by ordinance, enacted "that the action of said board of public works in designating said line be and the same is hereby approved, and the said City Railway Company is hereby granted said line and the right to the same in accordance with the terms, provisions and conditions of the contract and ordinance approving the same."

While there is no express stipulation that the additional line should be governed by the contract of April 24, 1893, which governs the other lines, still it seems to me, even without regard to the explicit language of the ordinance of May, 1893, that it must be held that such additional line falls within, and is to be governed by, that contract. Such, manifestly, was the purpose and understanding of the contracting parties, and I do not think their obvious intention can or ought to be defeated by the application of rigid and technical rules of construction. Here are two parties—the city by its board of public works and common council, and the defendant company—capable of contracting. It is too clear for debate that all these parties have agreed to the designation of the north and south line; that such designation has been approved by ordinance, and accepted by the defendant company. It is a fundamental rule in the construction of contracts that it is the duty of the court to ascertain and give effect to the intention of the parties, if lawful, whenever it can be done, "ut res magis valeat quam pereat." It seems to me, while the contract in regard to the north and south line is not technically formal, that, taken as a whole, in connection with the ordinance of April 24, 1893, it contains enough to be binding on both contracting parties.

But if I am in error as to the right of the defendant company to the north and south line, it would not aid the complainant. Prior to the designation of the additional north and south streets for the

use of the defendant, the complainant had no lines upon those streets except a fragment upon South Pennsylvania street, which had been practically, if not legally, abandoned. I do not think the complainant, under the ordinance of 1864 or 1865, had any vested right to commence the construction of a particular line without first obtaining the consent of the common council to "the location, survey, and construction" of such proposed line. Therefore, the complainant, having obtained no consent from the city to occupy the streets in question, has no right to complain of their occupation by the defendant company.

Other questions are presented in respect to the streets occupied by the complainant with the consent of the city. The defendant, by its answer, denies that it sets up any claim to the present occupancy of that part of any street upon which the tracks of complainant's railway are laid, or that it intends or threatens to lay and operate lines of electric railway on any street on which the complainant was operating an electric line, at the time suit was brought, "until after the expiration of its right thereto, if any it has." But from the terms of the contract and ordinance under which the defendant company has acquired the rights which it asserts, from the notice served upon the complainant, from the acts of defendant as disclosed in the record, as well as from the claims of its counsel, it seems apparent that the defendant company has been acting on the theory that the complainant's right to occupy the streets has ceased, and that under its contract it may rightfully take possession of them, and expel the complainant therefrom. In my opinion, the defendant company has no such rights. In so far as the defendant company claims the right to interfere with the complainant's free and unobstructed use of its lines of electric railway on all the streets now rightfully occupied by it, its claim is wrongful and injurious. To the extent necessary to protect its quiet and undisturbed use of these lines against invasion by the defendant company, the complainant is entitled to the aid of the court.

I entertain no doubt that the amended bill presents a federal question which gives the court jurisdiction. I have heretofore expressed my views on this question, and I do not think it needful to add anything to what I have already said on the same subject. Citizens' St. R. Co. v. City Ry. Co., 56 Fed. 746.