PENNSYLVANIA CO. FOR INSURANCE ON LIVES AND FOR GRANTING ANNUITIES v. JACKSONVILLE, T. & K. W. RY. CO. et al.

MERCANTILE TRUST CO. et al. v. PENNSYLVANIA CO. FOR INSURANCE ON LIVES AND FOR GRANTING ANNUITIES et al.

(Circuit Court of Appeals, Fifth Circuit. March 14, 1899.)

No. 668.

1. RAILROADS—RECEIVERS—FORECLOSURE—ACTIONS.

Stockholders of a railroad corporation brought a suit for a receiver, but, before hearing, a receiver was appointed in a subsequent foreclosure suit by the bondholders. The receiver was authorized to pay all operating expenses incurred within a certain time. Complainant stockholders were allowed to intervene in the bondholders' suit. A month after the appointment, on a hearing of both bills and the previous orders made thereon, the receivership was set aside, the proceedings in the bondholders' suit stayed, and the motion for a receiver in the stockholders' suit granted. The new receiver was authorized to pay all operating expenses incurred in the previous six months. On appeal, the order granting the stay in the bondholders' suit was reversed, and the former receivership restored, leaving the lower court to determine who should be receiver. Pending the appeal, all the property of the corporation was held and operated by the second receiver. Thereafter the lower court, acting in regard to both suits, removed the second receiver, and ordered that his accounts be filed, and all persons having claims against him file them with the clerk of the court, to be referred to a master. The next day the court appointed a new receiver, to whom the second receiver turned over all the property, including cash on hand; and he was authorized to pay all operating expenses incurred during the six months preceding the first order appointing a receiver. Thereafter the master's report on the claims referred was confirmed, and the sum found due as operating expenses under the second receiver, less the amount paid thereon, was adjudged a first lien on the property. Subsequently a decree was made in the stockholders' suit reciting a final decree of foreclosure in the bondholders' suit, and providing that all claims or liens against the corporation in the stockholders' suit should be transferred to the bondholders' suit. A like decree was entered in the bondholders' suit, and all the claims transferred were sent to a master, to investigate, and report priorities. Held, that the transfer of the claims against the second receiver, from the one suit to the other, and adjudging the operating expenses a first lien, was proper.

2. SAME—PROPER EXPENSES.

Compensation for the services of a master appointed to examine and pass on the accounts of a receiver of a railroad corporation is a proper charge against the property, under the former practice of the federal courts.

**8. SAME.**

The compensation of an attorney for a receiver (the receiver having been discharged, and the funds surrendered to the owner) is a proper preferred charge against the property.

Appeals from the Circuit Court of the United States for the Southern District of Florida.

Bill in equity by the Pennsylvania Company for Insurance on Lives and for Granting Annuities against the Jacksonville, Tampa & Key West Railway Company to foreclose a mortgage. The American Construction Company intervened. Also, a bill in equity by the American Construction Company against the Jacksonville, Tampa & Key West Railway Company for the appointment of a receiver. From a decree confirming the master's report as to the indebtedness of the railway company, and adjudging priorities, the Pennsylvania Company, in the first suit, and the Mercantile Trust Company and others, in the second suit, appeal. Affirmed.

John C. Cooper and R. H. Liggitt, for appellant Mercantile Trust Co.

T. M. Day, Jr., for appellee Jacksonville, T. & K. W. Ry. Co.

Before McCORMICK, Circuit Judge, and BOARMAN and PARLANGE, District Judges.

McCORMICK, Circuit Judge.    On July 6, 1892, the American Construction Company exhibited its bill in the circuit court of the United States for the Northern district of Florida against the Jacksonville, Tampa & Key West Railway Company, the Florida Construction Company, the Florida Commercial Company, and Robert H. Coleman, Charles C. Deming, Archibald Rogers, Frank Q. Brown, and John W. Candler, directors of the defendant railway company. The bill averred that on May 8, 1890, three distinct roads, namely, the Jacksonville, Tampa & Key West Railway Company, the Atlantic Coast, St. Johns & Indian River Railway Company, and the Sanford & Lake Eustis Railway Company, were each railroad corporations, and each owned and operated a railroad in Florida, and on that day these three railroad companies were consolidated into one, which took the name of the Jacksonville, Tampa & Key West Railway Company, and became the owner of the properties of the three constituent companies; that the stock of the new company (the defendant railway) was $3,010,000, of which the complainant owned, and was entitled to have certificates of stock to the par value of, $168,750, but that the stock had not been issued to it; that at the time of the consolidation of the constituent companies each had a bonded indebtedness aggregating $2,216,000, secured, respectively, by a mortgage on its railroad property, in each of which mortgages the Mercantile Trust Company of New York was trustee; that on May 15, 1890, the defendant railway company executed a series of bonds of the par value of $4,000,000, which were designated the "Consolidated Bonds," secured by a mortgage of even date upon the main line and its two branches, in which mortgage the Pennsylvania Company (appellant) is trustee; that of this issue the trustee held $2,-

216,000 for the redemption of the three series of first mortgage bonds, and that the remainder of the consolidated bonds were held as security for floating and otherwise unsecured indebtedness of the railway company; that the defendant Robert H. Coleman owned a majority of the stock of the Florida Construction Company, and controlled its board of directors; that the Florida Construction Company owned a majority of the stock of the railway company, and controlled the election of its board of directors, and the personnel of the boards of directors of the two companies was substantially identical, and Coleman controlled both directories; that a part of the so-called floating debt was illegal and fraudulent; that at one time, prior to the filing of the bill, the Florida Construction Company was indebted in a large amount, evidenced by its promissory notes, for which Robert H. Coleman was liable either as indorser or as surety, and that Coleman and the Florida Construction Company had caused notes of the railway company to be executed and substituted from time to time for the notes of the Florida Construction Company, thus relieving it and Coleman from this liability, and imposing the burden upon the railway company without any consideration; that Coleman claimed to own and hold interest-bearing notes of the railway company to the amount of $1,800,000; that the floating debt of the railway company, according to its books and financial statements, was $10,000 on December 31, 1888, $243,702.98 on June 30, 1890, and $1,787,784.75 on June 30, 1891; that the complainant had made application to the proper officers of the defendant company for explanations of the discrepancies and inconsistencies in the accounts of the defendant railway company, and as to the increase in its floating debt notwithstanding the rapid increase of its net earnings, and as to the heavy deficiency indicated, and as to the accounts between the Florida Construction Company and the defendant railway company, and those between the railway company and its president, and had made demand for the issue of its stock in the railway company, but that it had failed to gain the information it sought; that the officers and directors of the railway company, being interested as stockholders and directors of the Florida Construction Company, had failed to have prepared true statements of the accounts and expenditures thereof, and entirely failed and neglected to issue to the complainant the stock owned by it; that, if the affairs of the railway company were honestly and efficiently managed by officers and persons whose interests were not hostile to the interest of the stockholders of the defendant company, its stock would be valuable property; that the defendant railway company on or about September 24, 1888, entered into a contract with the Florida Commercial Company, wherein it purchased of that company all or nearly all of the bonds and stock of the Florida Southern Railway Company and the stock of the St. Johns & Lake Eustis Railway Company, then operating lines of railroad in Florida; that the defendant railway company purchased these bonds and stock of the two other named railway companies for the purpose of ultimately becoming the owner of the railroads of these companies, and it paid for the stock and bonds by issuing a series of its own bonds, known as "Collateral Trust

Bonds," amounting in the aggregate to the sum of $3,592,000, par value, which it delivered to the Florida Construction Company, and pledged the stock and bonds it had purchased as collateral security for this issue of collateral trust bonds, and that, if this contract was valid, the collateral trust bonds were a valid and existing indebtedness of the defendant railway company; that, though not secured by any mortgage on its property, they were secured by mortgage on the bonds and stock of the Florida Southern Railway Company and the St. Johns & Lake Eustis Railway Company, and that this contract with the Florida Commercial Company was illegal and voidable; that the plaintiff did not know, and had no means of knowledge except by the discovery as prayed for in its bill, whether or not the contract was beneficial to the complainant as a stockholder of the defendant railway company, and that it reserved the right to elect whether it would repudiate or ratify the same when it had acquired full knowledge of the facts and circumstances attending the purchase and the effect thereof; that the Florida Construction Company was not then, and had not been for several years, engaged in the construction of any railroad, but that it was the owner of the capital stock of the Indian River Steamship Company and of the Jupiter & Lake Railway Company, corporations organized and doing business in Florida; and that the cost of constructing and maintaining these properties, and of operating the same, was paid in large part out of funds of the defendant railway company, and for the money paid on this account, amounting, as the complainant was informed and believed, to $200,000, the defendant railway company had no security, but that the same formed part of the large indebtedness of the Florida Construction Company to the defendant railway company.

The prayer of the bill is for a discovery and an accounting, for an injunction and a receiver, and for the cancellation and annulment of the contract with the Florida Commercial Company, if, on full discovery, it shall be shown to be for the interests and benefits of the complainant and other stockholders to have the contract canceled, and for general relief. The bill was verified by the complainant's secretary, supported by assisting affidavits and other exhibits; and, on the day that it was exhibited, the district judge passed an order granting a temporary injunction as prayed for in the bill, and requiring the defendant railway company to show cause on or before the 11th day of July, 1892, why a receiver should not be appointed. On the day named, the defendant railway company appeared by its counsel, Cooper & Cooper and T. M. Day, Jr., and moved the court for an extension of the time, and for a continuance of the hearing of the complainant's motion for the appointment of a receiver and for an injunction for a period of 30 days, or such time as the court might designate. This application was supported by the affidavit of Robert B. Cable, the general manager of the defendant railway, and of Charles C. Deming, its vice president and secretary. Whereupon the district judge ordered that the motion of the complainant be continued until July 28, 1892. On the 23d day of that month the Pennsylvania Company, trustee in the second mortgage bonds, exhibited its bill of complaint against the defendant railway company

to the Honorable Don A. Pardee, circuit judge (not then in the state of Florida), verified by its president, and supported by exhibits and assisting affidavits, accompanied by the acceptance of service by the defendant railway company, and its admission of the truth of the averments in the bill, which bill was in the customary form, prayed for a foreclosure, for the appointment of a receiver and for injunction, as usual in such cases; and both parties having united in the request that, if the application for a·receiver should be granted, Robert.B. Cable be named as such receiver, the circuit judge thereupon passed his decree, of date July 23, 1892, appointing Robert B. Cable receiver,—noting in the decree that the appointment was provisional, to the extent that any person or party having an interest in the property of the defendant railway company might show cause within 30 days why the appointment should not be confirmed, and that the appointment should not affect or forestall any action that the court or any of its judges "may hereafter see proper to take on any bill heretofore filed in this court against said railroad company, wherein a receivership has been also prayed for." These two bills were each filed in the circuit court at Jacksonville, then in the Northern district of Florida. Hereafter in this·opinion the case first brought will be styled the "stockholders' suit," and the other the "bondholders' suit."

On the day to which the hearing of the motion of the complainant in the stockholders' suit had been continued, that motion came on for hearing before the district judge; and the defendant railway company appeared by its counsel above named, and by the affidavit of its vice president, Charles C. Deming, and showed, for cause why the complainant's motion should not be granted, the institution of the bondholders' suit, and the order of the circuit judge thereon, with other grounds not necessary to notice. On the same day the complainant in the stockholders' suit presented its petition of intervention in the bondholders' suit, alleging the exhibiting of its bill, as above shown, to which bill, and the exhibits and affidavits in support thereof, it prayed that reference might be made as often as might be necessary; that the court had granted a temporary injunction, and had ordered the defendant railway company to show cause on or before the 11th day of the current month why a receiver should not be appointed, and that on the day last named the railway company had moved the court for further time to prepare to resist the motion, and to show cause why a receiver should not be appointed, representing that it could show good cause; that on these representations the court had extended the time; that, after thus procuring the extension of time, the defendant company caused the bondholders' suit to be brought; that the same was a collusive suit, and, on the application of the complainant therein, the defendant consenting thereto, the circuit judge granted an order appointing Cable receiver. The petitioner prayed a reference to the bill and affidavits on which the receiver was appointed, averring that it appears from an examination of the bills and the exhibits and affidavits in the two causes above mentioned that the second suit is collusive, and that the circuit judge was imposed upon; that Cable is the man-

ager and appointee of the directors of the company, against whom the petitioner in its bill has made charges of gross fraud, mismanagement, and diversion of the funds of the company; that the directors are the owners of the floating debt mentioned in the petitioner's bill, and are the very persons, if any one, who have applied to the complainant to bring the suit wherein Cable has been appointed receiver; that it fully appears by the pleadings and proceedings that the railway company and its directors represent and control both the defendant and the complainant in the bondholders' suit; wherefore, and for divers other good causes appearing of record in the pleadings and the exhibits and affidavits, to which reference is prayed, the petitioner prays leave to file its petition for intervention, and prays that the order appointing a receiver be set aside and vacated, and that all proceedings in the bondholders' suit be stayed until the further order of the court, and for such other different and further relief as to the court may seem just and equitable.

The subject-matter of both bills, the exhibits supporting each, and the previous orders made thereon, respectively, being thus brought on for hearing at the same time before the court in which each bill was filed, was contradictorily argued by counsel, and was held under argument and consideration by the court until August 4, 1892, when, on consideration of the intervening petition and the two several bills, and the exhibits and affidavits in support of each, it was decreed that the order appointing Robert B. Cable receiver be set aside and vacated, and that all further proceedings in the bondholders' suit be stayed until the further order of the court. And in the stockholders' suit the motion of the complainant for the appointment of a receiver was granted, and Mason Young was appointed, and invested with the powers and charged with the duties customary in such receiverships. From these orders appeals were taken to this court. We held that the trustee in the second mortgage was entitled to have the property therein mortgaged taken possession of by the court through the appointment of a receiver at its suit; that the order granting the stay of proceedings in its suit should be reversed, and the stay dissolved; that the receivership granted on July 23, 1892, should be restored; and that the orders in reference to the receivership should be had in the bondholders' suit, and the reports of the operations, earnings, and expenses of the property covered by the consolidated mortgage, should be made to the court in that case. It was left to the circuit court to determine what person was the proper one to execute the office of receiver,—to continue the receiver, Cable, or to appoint a more suitable person in his place, as the relations of the parties, and the character and condition of the property, might, in the judgment of that court, require. 2 U. S. App. 606, 5 C. C. A. 53, and 55 Fed. 131. The decree appealed from in the stockholders' suit was reversed, except as to so much thereof as granted the injunction, which was modified, and as modified was affirmed. In each of these cases an application was duly made for a certiorari to the supreme court, which applications were finally disposed of by that court March 27 and April 3, 1893. 148 U. S. 372–388, 13 Sup. Ct. 758. Pending proceedings on the appeals to this

court and on the applications for certiorari to the supreme court, all
the properties of the defendant railway company, as specified and
indicated in the decree appointing Young receiver, were held and
operated by him as such, under the authority, direction, and orders
of the circuit court.

On April 7 and 8, 1893, the circuit judge and the district judge, sit-
ting together, in open court, and concurring, passed the decrees in
the two suits, putting into effect in each the mandate of this court.
By these decrees the circuit court ordered that the decree appointing
Young receiver be vacated, the property which he held as receiver be
forthwith restored to the officers of the railway company, and his ac-
counts filed with the clerk, within 20 days, and all persons having
claims or demands due, arising out of the operation of the property
by Receiver Young, were required to file the same with the clerk,
which accounts and claims, on being filed, should be referred to a spe-
cial master, to be. thereafter designated, for investigation and report;
that the American Construction Company pay the costs of the ap-
pealed causes; that the order of August 4, 1892, staying proceedings
in the bondholders' suit,.and vacating the order of July 23, 1892, be
set aside, and the stay of proceedings dissolved; that the receivership
granted and created by the order dated July 23, 1892, be restored; and
that the property described in the order be restored to Cable, as re-
ceiver.    After passing the decrees on April 7, 1893, putting into ef-
fect the mandates of this court, the circuit court on the next day, for
reasons assigned, not derogatory to Receiver Cable, or to his capacity
to manage the railroad, considered that it was best for another re-
ceiver to be appointed, and passed a decree in the bondholders' suit
appointing Joseph H. Durkee, the present receiver.    On the same day
(April 8, 1893) an order was passed in the stockholders' suit appoint-
ing Charles S. Adams, Esq., special master, to whom, as such master,
the accounts of Receiver Young, and the claims of all other persons
arising out of his operation of the property, were to be referred.    This
last order bears only the signature of the district judge.    On Novem-
ber 10, 1892, the complainant in the stockholders' suit amended its
bill so as to make the trustee in each of the mortgages defendants
therein, and prayed for process of subpœna against each of them, and
on the 22d day of November obtained an order for making substituted
service on each of them.    This order was served on the Mercantile
Trust Company on December 10, 1892.    On December 16, 1892, each
of these trustees, specially limiting its appearance to the purposes of
the motion, and of objecting to the jurisdiction of the court, appeared
by its solicitor, R. H. Liggitt (the names of associated solicitors being
joined), and moved the court to vacate and set aside the orders for
substituted service on each of them, on the ground that they were
not residents of the district, and because the suit is not such a one as
substituted service can be made therein.    These motions were not
acted on.    The complainant in the bondholders' suit, by its solicitors,
Cooper & Cooper, on June 28, 1893, asked and obtained leave to
amend its bill by making the Mercantile Trust Company a party de-
fendant.

In June, 1893, Special Master Adams proceeded to take testimony
touching the matters that had been referred to him, the solicitors for

the respective parties interested in the litigation being present. In August he made a partial report, showing what had been done up to that time, and much that remained to be done. He continued the taking of testimony from day to day as rapidly as the convenience of counsel permitted, until April 30, 1894, at which time the parties closed the testimony. Thereupon full argument by counsel was heard by the master; and at the close of the oral argument, at his request, the different counsel, including Messrs. Cooper & Cooper, filed briefs. The master made a very full and able report of his findings, which was filed June 6, 1894. To this report the defendant railway company, by its solicitors, Cooper & Cooper and T. M. Day, submitted 21 exceptions, touching more or less all of the substance in the master's report, and thus renewing before the court the exceptions which they had been most alert, fertile, and strenuous in urging before the master pending his hearing and consideration of the matters. An act to change the boundaries of the judicial districts of the state of Florida, approved July 23, 1894 (28 Stat. 117, c. 149), provided for holding terms of the circuit court for the Southern district at Jacksonville, and that all cases then pending in the circuit court for the Northern district at Jacksonville be transferred to the said circuit court for the Southern district. On this account, probably, the master's report and the exceptions thereto did not come on to be heard until December, 1895. The hearing thereof was then had before the Honorable James W. Locke, the judge for the Southern district of Florida. He was a member of this court, and took part in the hearings and decision of the appeals above referred to, when the same were before this court. After having fully heard the report of Receiver Young, and of the special master thereon, and all the exceptions thereto, the circuit court, on December 27, 1895, adjudged and decreed that, in regard to all accounts approved and allowed in the master's report as paid or unpaid, the same be approved and allowed, and the master's action therein confirmed; that the amounts conditionally approved by the master be approved upon a compliance with the conditions declared and specified by him; that the amounts found by the master to be due from the railway company as operating expenses, less such amounts as have already been paid by the present receiver upon orders of the court, to wit, $88,086.32 (remaining unpaid), be declared to be due from the railway company, and a first lien upon the property. And it was further adjudged and decreed that the amount of $46,374.39, found by the master to be due from the defendant railway company on account of the operation of the Florida Southern Railway Company, be approved as justly due; but it appearing that Mason Young had turned over and paid to the Florida Southern Railway Company, upon his retiring from the receivership, the sum of $47,558.95,—a sum exceeding the indebtedness found due as above,—it was adjudged and ordered that the sum of $46,374.39 is due from the Florida Southern Railway Company.

On January 17, 1896, the circuit court passed a decree in the stockholders' suit as follows:

"It appearing to the court, in the above-entitled cause, that the entire corpus of the railroad property of the defendant the Jacksonville, Tampa & Key

West Railway Company is in the possession and control of the receiver of this court, heretofore appointed in the cause of the Pennsylvania Company for Insurance on Lives and for Granting Annuities against the Jacksonville, Tampa & Key West Railway Company, the American Construction Company, and the Mercantile Trust Company, and that any decree heretofore made or to be made in this cause, establishing a lien of priority, and requiring payment from the corpus of the property of the said Jacksonville, Tampa & Key West Railway Company, or from the proceeds of the sale thereof, must be transferred to the cause under which the said receiver is acting, for payment; and it further appearing to this court that a final decree of foreclosure has been entered in the said cause of the Pennsylvania Company, etc., and that it is necessary to ascertain and determine the status of all claims against the corpus of the property of the said Jacksonville, Tampa & Key West Railway Company in the hands of the said receiver, and to classify them in order of their priorities, and determine the aggregate amount of the same, before a sale of the said property under the foreclosure decree can be made: It is hereby ordered and decreed that all interventions or claims in this cause which have been heretofore decreed to be liens upon the property of the Jacksonville, Tampa & Key West Railway Company, together with the approved unpaid operating expenses of Mason Young, late receiver herein, and interventions or claims, all interventions or claims not yet finally adjudicated, which are claimed to be entitled to be liens upon the corpus of the property of the said railway company, be, and are hereby, transferred to the cause of the Pennsylvania Company for Insurance on Lives and for Granting Annuities against the Jacksonville, Tampa & Key West Railway Company, etc., for such reference, decree, or order as may be made in that cause."

And on the same day the following decree was passed in the bondholders' suit:

"It appearing to this court that it is desirable and necessary to adjudicate, determine, and classify the status and priorities of all interventions, claims, judgments, and decrees heretofore rendered in this cause, or now before this court for trial and determination, including such claims and interventions in the cause of the American Construction Company against the Jacksonville. Tampa & Key West Railway Company as have been transferred to this cause, before a sale of the corpus of the defendant the Jacksonville, Tampa & Key West Railway Company, in the hands of the receiver of this court, under final decree in foreclosure heretofore rendered, it is ordered, adjudged, and decreed that all unpaid interventions, claims, judgments, and decrees brought in this cause, or originating in the said cause of the American Construction Company against the Jacksonville, Tampa & Key West Railway Company, and transferred to this cause, including the approved, unpaid operating expenses of Mason Young, receiver in said cause, whether the same have been fully adjudicated, or are now before the court for trial and determination, be, and the same are hereby, referred to Charles S. Adams, Esq., as special master herein, with instructions—First, to take testimony and report his findings of law and fact upon all matters not heretofore adjudicated and determined; second, to investigate and report to this court the relative priorities of all matters heretofore adjudicated, the priorities of which have not been declared by this court; third, to ascertain and report any items of indebtedness under the present receivership; fourth, to ascertain and classify as nearly as possible all interventions, claims, judgments, etc., referred to and passed upon by him, and report the aggregate amounts as classified; and, fifth, to make report of his acts and doings thereunder at the earliest practical time."

In obedience to this order of reference, the special master set February 23d for beginning the hearing of the matters involved, gave due notice thereof by publication, and personally served the attorneys of record with notice of the hearing. The solicitors for the complainant and for the committee of the first mortgage bondholders, on behalf of these parties, filed written objections against the consideration of any of the indebtedness of Mason Young, as receiver, in

the case of the American Construction Company against the defendant railway company, on the ground that the complainant and the bondholders never intervened nor were made parties to that suit, and that the orders of the court in transferring the claims and interventions to this cause were irregular and without authority of law, and upon the further ground that all of the claims were subsequent in point of time to the first mortgage, and subordinate in dignity thereto.    After a somewhat protracted and very full hearing on all the matters embraced in the reference, the master made his report. It was exhaustively excepted to by the solicitors for and on behalf of the complainant and of the committee of first mortgage bondholders.    The exceptions were all overruled, and the report of the master confirmed by a decree passed November 11, 1897, from which this appeal is taken.

The assignments of error are, substantially:    (1) That the court had no authority to transfer the matter of claims against Mason Young, receiver, from the stockholders' suit to the bondholders' suit; (2) that the court had no authority to adjudicate the indebtedness of Mason Young to be a first lien on the railroad property; (3) that the court erred in finding that $88,086.32, the unpaid operating expenses of Receiver Young, $593.33 allowed Johnson & Wilson, $484.56 allowed the Sanford & St. Petersburg Railroad Company, $1,600 allowed Special Master King, $97.23 allowed Snodgrass & Field, and $191.20 allowed John G. Christopher, are a first charge on the property, and the $500 allowed J. R. Parrott has a lien prior to the second mortgage.

It is apparent from the record that immediately after the passing of the decrees on April 7 and 8, 1893, Receiver Young surrendered to Receiver Durkee all the property of the defendant railway which was covered by the first and second mortgages, including $22,648.27 cash on hand to the credit of that estate at the time of the surrender.    It also appears that he duly filed his accounts as receiver of that estate. He surrendered the properties of the Florida Southern Railway Company, including $47,558.95 to its credit, to the owners thereof, in compliance with the order of April 7, 1893; and they committed it to their general manager, Robert B. Cable.    In the order of July 23, 1892, appointing Cable receiver, it is provided, among other things, that he is authorized to pay the indebtedness of the railway company heretofore incurred for expenses of operation during the —— months next preceding the date of the order.    In the decree passed August 4, 1892, in the stockholders' suit, after the bondholders' bill had been exhibited, and simultaneously with the order staying proceedings under that bill until the further order of the court, Young was appointed receiver of the property (both the bills and all the proceedings thereunder being fully before the court, and full consideration having been given thereto), and was thereby authorized and ordered to pay all indebtedness of the railway company theretofore incurred for expenses of operation, including repairs, supplies, material, labor, and services which had been incurred within the period of six months next preceding the date of the order,    In the decree of April 8, 1893, appointing Durkee receiver, it is provided, among other

things, that he is thereby authorized to pay the indebtedness of the railway company theretofore incurred "for expenses of operation during the six months next preceding the date of the order heretofore made appointing a receiver in this cause"; that is to say, next before July 23, 1892.    At this time the property had been in the custody of the court more than eight months, operated and controlled under the authority and direction of the court, by its hand, Receiver Young, maintaining the same, discharging its duties to the public with conscientious regard to the interest of creditors and stockholders. While certain issues between these creditors and the stockholders with reference to the properties were being submitted to this court and to the supreme court, certain court costs, to the amount of a few hundred dollars, had been incurred, and were adjudged against the stockholders.    In the same decree it was provided, among other things, that all persons having claims or demands arising out of the operation of the property by Receiver Young "are required to file the same with the clerk of the court, to be referred to a special master, to be hereafter designated, for investigation and report to the court." It is clear that the chancellors passing these decrees had in mind all the parties to the bills in both of these suits, and recognized, from the very necessity of the case, that persons who had contributed to the operation of the road during this period of the receivership were entitled to the same protection that they would have been entitled to receive if they had extended the same credits during the same period of time to Receiver Cable, had he been permitted to hold and operate the property.    It seems to us that what we have thus far advanced shows that the first and second assignments of error are not well taken.

The item of $88,086.32, balance remaining unpaid of the operating expenses of Receiver Young at the date of the master's report, and of the decree confirming it, is only a little more than one-half of such expenses ($165,236.34) that remained unpaid at the date of the discharge of Receiver Young, after which Receiver Durkee paid thereon $77,150.02 "upon orders of court and upon the consent of counsel," leaving the unpaid balance of $88,086.32.    Of this indebtedness ($165,236.34), the master's report says that, without exception, it consisted of actual necessary operating expenses, such as any receiver, or any other management of the railroad properties, must have incurred in the maintenance and operation of the property.    Of the item of $595.35 adjudged in favor of Johnson & Wilson, and the item of $484.56 adjudged in favor of the Sanford & St. Petersburg Railroad Company, the master says that these items come under the same general head of operating expenses.    The record does not contain any evidence, or show that any was offered before the master or before the court, tending to contradict the master's findings as to the just amount and character of these expenses.    Touching the item of $1,600 adjudged in favor of John King, it appears that he was appointed special master in the stockholders' suit to examine and pass on the accounts of the receiver, and to make reports to the court thereon; that for the period of about eight months he, with the assistance of a clerk, did regularly examine the reports and vouchers

of Receiver Young, and in due time make his report thereon to the court; that after the discharge of Receiver Young this special master made application to the court to be allowed compensation for his services, which application was referred to John E. Hartridge, Esq., as special master, to examine into the matter, and to report thereon, in obedience to which reference Master Hartridge made report on April 7, 1896, finding that the sum of $1,600, exclusive of salary to his clerk, would be a reasonable compensation for Special Master King for the period for which he served, and recommending that he be paid that amount. This report was excepted to by the parties, and it, with the exceptions thereto, came on to be heard July 1, 1897, when the exceptions were overruled, and the report confirmed. The practice in this circuit, until the adoption of our recent rule in the circuit courts in reference to reports of receivers in charge of and operating railroad corporations and properties pending foreclosure proceedings, authorized, if it did not require, the current discharge of such services as Special Master King performed. The item of $500 adjudged in favor of J. R. Parrott figures in Master Adams' report, in the stockholders' suit, as compensation of counsel for Receiver Young, not allowed as an independent intervention, but approved as an allowance to the receiver for unpaid balance on compensation of J. R. Parrott as his counsel. It has been, and still is, customary, and we think necessary, to allow such receivers to employ counsel; and Receiver Young having been discharged, and the property and the balance of funds remaining in his hands having been ordered to be surrendered to the owners, it was not improper to adjudge this unpaid balance due the attorney as a charge in his favor against the property prior in rank to the second mortgage. It appears from the report of Master Adams that, under orders of the court, large sums of money, exclusive of the proceeds from the sale of receivers' certificates, have been expended by the receivers in the payment of interest on the bonded indebtedness, and for additions, betterments, and permanent improvements to the mortgaged properties, and that the amounts thus appropriated greatly exceed the amount remaining unpaid of the operating expenses and charges adjudged in the decree to have a lien on the corpus of the mortgaged property. We deem these suggestions sufficient to support our conclusion that the assigned errors embraced in our third grouping are not well taken.

Having carefully examined the record touching all the matters affected by the assignments of error not withdrawn on the hearing of this appeal, we find no ground for reversing the decree of the circuit court, and it is therefore affirmed.